38

CARLO BIANCHI AND COMPANY, INC., Appellant, *v.* STATE OF NEW YORK, Respondent. (Claim No. 34532.)

Third Department, July 19, 1962.

*McClung, Peters & Simon* (*John R. Davison* of counsel), for appellant.

*Louis J. Lefkowitz, Attorney-General (George H. Rothlauf* of counsel), for respondent.

*Per Curiam.* Claimant entered into a contract with the State in May, 1954 for the construction of portions of a highway in Orange County which is known as the "Quickway". The contract included the construction of 4.47 miles of four-lane highway divided by a mall and the construction of six bridges.

The claim is based mainly on purported breaches of contract by the State in the construction of the road through a swampy area; and for breaches in connection with the driving of piles and delays incurred in the construction of some of the bridges. The Court of Claims, after a trial, has disallowed all of the items of damage except those arising from the pile driving item and for two other minor items, for which it has allowed $42,-975.48 including interest. Claimant contends this is inadequate.

A substantial part of the damage asserted by claimant, $575,-000 or nearly half the claim, rests upon the manner in which the State required the performance of the contract through a swamp area some 8,800 feet across from east to west. On the west side of this area was a large rock cut, and in planning the contract the State and the claimant expected that the material excavated for the purpose of the road from rock on the west side of the swamp would be used as fill for the road in the swamp area.

The State expected that there would not be sufficient material from the rock excavation for this purpose and that therefore claimant would be required to use "borrow material", i.e., from sources outside the road excavation itself, taken from the east side of the swamp. The claimant, planning the job, intended to start making the swamp fill from both sides of the swamp at the same time, using material from the rock cut on the west and borrowed material on the east, and constructing the area for two lanes of the highway first by having the operations from each side meet somewhere in the middle of the swamp, and then proceed to use the completed fill to carry material for the other two lanes.

The "balances" of materials intended to be used, as indicated by the State's preliminary surveys, showed that the materials for the fill would be drawn from these two sources, one on each side of the swamp; and the method proposed by the claimant in these circumstances seems entirely practical and economical. But in actual construction, the State engineers found that the material from the rock excavation would be sufficient for the entire fill; and the State required claimant to use this material for the fill which was necessary to excavate for the purpose of

the construction of the highway, rather than "borrow" fill from outside sources on the other side.

We see no breach of contract here; and we regard the Court of Claims as right in dismissing this part of the claim. The State made no guarantee that the quantity of material on the west side of the swamp would not be sufficient to fill in the entire embankment area or that borrow material from other sources would be used. The risk in relation to these matters was one of the conditions known to claimant in undertaking to do the job. There was a "Special Note" in the contract: "Due to the fact that there may be a reduction in the amount of unsuitable material to be excavated subject to field conditions, and extent of same A. O. B. E., the Contractor's attention is called to the fact that there may be a considerable reduction in the amount of outside borrow."

The Public Works specifications provided that "borrow" material could be used if there "is not sufficient excavated material of a suitable quality to complete the embankments", and further provided that "all suitable materials from the excavation shall be placed in roadway embankments". The general specifications gave clear warning that variations of limits of earth and rock "affecting the quantities of earth and rock excavation may occur" and the contractor must himself find out about these things "by personal investigation and research". We think that the engineer in charge was right, and well within the contract, in directing the contractor to use the rock excavation for the fill.

Another main source of damage asserted is the delay encountered by claimant in getting access to a bridge site to begin pile driving for the bridge construction. This was a bridge over the Erie railroad tracks. The road approaches to the bridge were being laid down by another contractor. The west abutment was to be on a fill 20 feet high at the abutment and was to be 2,700 feet long. It was to require from 600,000 to 700,000 cubic yards of material.

The specifications for this embankment, in accordance with usual State practice, known to the claimant, was that the embankment leading to the bridge abutment be put down in "successive uniform layers across the area of the entire embankment". It is not disputed that for the other State contractor to do the work this way delayed claimant's ability to put in the piles for the west side of the bridge abutment, since pile driving depended on the fill in place on that side. The State engineer refused to direct the other contractor to put in "stub" fill at the site of the bridge abutment which would have permitted claimant's pile

driving to proceed. On the contrary, the State's engineer in charge of the other contractor's job required that contract to be performed in accordance with specifications, i.e., the fill to be laid in successive uniform layers, although stub fill was later allowed after the uniform layer fill had reached substantial height. This is not a breach by the State of claimant's contract, as the Court of Claims has held.

Claimant has been allowed by the Court of Claims damage of $19,643.51 for " overdriving of piles " and $8,500 for additional expenses due to such overdriving. Claimant contends it should have been awarded $97,307.29 for this item, including delay and additional expenses. Claimant fails to demonstrate on this record that the Court of Claims made an erroneous award for damage resulting from pile driving.

A State witness testified that out of a total of 523 piles which were driven on this contract only 50 piles were overdriven. Appellants argue that from the plans and from the State's daily pile driving reports, it is shown " that practically every pile on this job was required to be overdriven ". Still the State's witness testified in detail as to which piles were, and which were not, overdriven in his opinion and we see no reversible error in the acceptance of his testimony in substantial part by the Court of Claims in arriving at damage.

There were delays in obtaining access to certain of the bridge sites, however, for which we believe claimant is entitled to damages disallowed by the Court of Claims. There is proof that claimant entered on the contract site of the Route 17 relocation bridge with work forces and equipment about June 14, 1954. There were then privately owned structures on the area in which the bridge was to be built which interfered with the operation. The State had not then acquired title to the parcels of land involved and claimant was instructed not to move any structures until permission was given by the State engineer. Permission was given to move the last structure on July 21.

The State was required by its contract to use due diligence to make the site available, and although the basic findings of the facts we have recited were made by the Court of Claims, the court refused to find that the State failed to use due diligence in making the site available to claimant. We think a failure to use due diligence is demonstrated, and that claimant was delayed from June 14 to July 21.

Although there was a specification in the contract warning that the State could not guarantee immediate possession of " all buildings within the contract limits ", nevertheless the State agreed that any legal proceedings necessary to gain possession

would be instituted by the State " with due diligence ". Claimant was similarly delayed from June 24 to August 20 in obtaining access to the bridge site for the County Road No. 13 bridge because of the existence of a house at the site of the east abutment pier and from June 20 to July 8 in gaining access to the railroad right of way for the construction of the Lehigh and Hudson Railroad bridge because of a failure of the State to enter into an agreement with the railroad for such access.

These delays alone, and they are the only ones which we find attributable to the State, did not themselves extend claimant's work into Winter weather or otherwise increase the cost of doing the actual unit items of work, but we find claimant had an operational and overhead loss and incurred expenses due to these delays in the sum of $25,000. The provision of the contract that there will be no damage for delays in availability of any part of the site does not bar recovery where the State has in this respect failed to perform its undertaking, and hence breached the provision of the contract to make the sites available with due diligence. (*Wright & Kremers* v. *State of New York,* 263 N. Y. 615.)

The judgment should be modified on the law and the facts to allow claimant $61,450.79, with interest from August 15, 1956, and as thus modified affirmed, with costs to appellant.

BERGAN, P. J., COON, GIBSON, HERLIHY and TAYLOR, JJ., concur.

Judgment modified on the law and the facts to allow claimant $61,450.79 with interest from August 15, 1956 and as thus modified, affirmed, with costs to appellant.